**PAUL W. BLAKE (SBN: 94963)**
Law Offices of Paul W. Blake
355 South Grand Ave Ste 2450
Los Angeles, CA 90071
Tele: (LA) 213-215-1820
Tele: (SD) 619-908-6429
Fax: (760) 451-9860
Email: paulwblake@att.net
Attorney for Defendant
Keith Pullam

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: |
| Plaintiff, | **11CR-00922(12)-DDP(A)** |
| vs. | **SENTENCING MEMORANDUM** |
| KEITH PULLAM (12), | Date:   September 12, 2013 |
| Defendant | Time:   02:30 p.m. |
| | HONORABLE DEAN D. PREGERSON |
| | United States District Judge |

    TO THE CLERK OF THE ABOVE ENTITLED COURT, UNITED STATES ATTORNEY ANDRÉ BIROTTE, JR., AND ASSISTANT UNITED STATES ATTORNEY J. LANA MORTON-OWENS:

    KEITH PULLAM, the Defendant in this case, by and through his counsel, PAUL W. BLAKE, submits the following Sentencing Memorandum for the Court to consider before imposing its sentence.

- 1

The position of the Defense is based upon the attached position paper, the Pre-Sentence Report (hereafter PSR), any exhibits and letters of support, and upon any such further evidence and argument that may be presented at the sentencing hearing.

DATE: August 28, 2013        Respectfully submitted,

                                          */s/ Paul W. Blake*
                                          PAUL W. BLAKE
                                          Attorney for Defendant
                                          Keith Pullam

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

# I.

## STATEMENT OF FACTS

Defendant KEITH PULLAM is to be sentenced on September 12, 2013 after pleading guilty on May 29, 2013 on Count One of a 26-count multiple defendant indictment charging him with Conspiracy to Distribute Controlled Substances, specifically the distribution and diversion of OxyContin away from usual medical practices, a violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(C).

# II.

## SENTENCING CALCULATIONS

**A.**  Pre-Sentence Report

The Pre-Sentence Report by the Probation Office presents the following sentencing calculation:[1]

Base Offense Level (USSG § 2D1.1(c)(7))
28.8 grams OxyContin                                    **26**
Acceptance of Responsibility
(USSG § 3E1.1(a) and (b)):                              **-3**

Total Offense Level:                                    **23**

Mr. PULLAM has six Criminal History Points for a Criminal History Category of III[2] with the sentencing range being 57 to 71 months.[3]

---

[1] Pre-Sentence Report (PSR); July 31, 2013; Document 476; p16
[2] Id.; p22 ¶152
[3] Id.; p4

- 3 -

# III.

## DEFENSE CLARIFICATION TO THE PRE-SENTENCE REPORT

The amount of drugs used for calculating the base offense level should consist of the amount listed under the plea agreement's Factual Basis found in paragraph eleven. Specifically, it should be 270 OxyContin pills representing those listed in Overt Acts 30, 31 and 32 used and not 360 pills as listed by the PSR. Therefore, 270 pills multiplied by 80mg is 21,600mg or 21.6 grams of OxyContin multiplied by 6,700 grams of marijuana which becomes 144,720 grams or 144.72 KG of marijuana. The Defense recognizes that the base level of 26 will not change but the Defense wishes to be on record with the Court that the amount of OxyContin involved should be calculated per the plea agreement.

# IV.

## DEFENSE SENTENCING POSITION

The Defense respectfully recommends a sentence of 30-37 months for Mr. PULLAM. The Defense recommends the following departures and mitigating factors should be applied to Mr. PULLAM'S sentencing.

**A.** Mitigating Role (USSG § 3B1.2(b))

Mr. PULLMAN had a mitigating role in this offense as defined at USSG § 3B1.2, comment. (n.3(A)) as "a defendant who plays a part in committing the offense that makes him substantially less culpable than the *average* participant.". (Emphasis added) The application of a mitigating role "is based on the totality of the

- 4 -

circumstances and involves a determination that is heavily dependent upon the facts of the particular case." USSG § 3B1.2, comment. (n.3(C)).

Mr. PULLAM worked for Lake Medical Group as one of a number of "cappers" and "runners" used by the clinic. Lake Medical Group was involved with submitting fraudulent claims under Medicare and Medi-Cal for medical services not rendered or services not needed or for non-existent patients. Also Lake Medical Group operated as a "prescription mill" for prescriptions of OxyContin under the Medicare prescription plan for patients who weren't in need of the drug. Mr. PULLAM's job as a "capper" was to recruit patients, who would be paid, for the scheme and as a "runner" to accompany patients with OxyContin prescriptions to the participating or other pharmacies and then bring back the OxyContin to Lake Medical Group which then would sell the drug on the street.

Mr. PULLAM was paid by Lake Medical Group for each patient he recruited and for his delivery of OxyContin patients to pharmacies and the return of the filled patient's OxyContin prescription back to Lake Medical Group.

The Medicare fraud in this case involved clinic owners, clinic doctors, clinic physician assistants, clinic administration staff, a billing company, pharmacy owners and pharmacy technicians. Without them, there would be no fraud. This scheme needed and

depended upon the above medical clinic owners and operators, doctors, pharmacy owners, and pharmacy technicians in order to even come to fruition and to continue operating. The runners and cappers are minor players in the conspiracy. They were paid for specific actions – recruit patients to receive OxyContin prescriptions and then accompany them to participating or other pharmacies to have the prescriptions filled. They did not share in the fraud benefits which involved $2.7 million for prescribed OxyContin alone. They did not benefit even moderately from the scheme when compared to the operators of Lake Medical Clinic who "used cash proceeds of the conspiracy to gamble at casinos, to purchase luxury good, including automobiles and jewelry, and to buy OxyContin." PSR p11 ¶48. Mr. PULLAM was a minor participant in this fraud. Minor participant is defined as "a defendant who is less culpable than most other participants[.]" USSG § 3B1.2, comment. (n.5). The "cappers" and "runners" weren't uniquely skilled as to be indispensable as were the clinic operators, doctors, clinic medical personnel, billing agents, pharmacy owners and pharmacy technicians. "Cappers" and "runners" could be easily replaced by others to work for a fee. Mr. PULLAM worked for a fee for particular actions. He was at the very bottom of importance in the operation of this fraud.

For these reasons, Mr. PULLAM is deserving of a minus two departure pursuant to USSG § 3B1.2(b) for having a minor role in this fraud.

**B.**   Acceptance of Responsibility (USSG § 3E1.1(a) and (b))

Mr. PULLAM has clearly shown acceptance of responsibility for his actions pursuant to the conditions for a minus two departure under USSG § 3E1.1(a). The Government has also stated its intentions to file motion under 3E1.1(b) for a further one-level reduction if 3E1.1(a) conditions are met. Mr. PULLAM is deserving of a minus three departure for Acceptance of Responsibility.

**C.**   18 U.S.C 3553(a)

The United States Sentencing Commission Guidelines became advisory after United States v. Booker, 543 US, 220, 245 125 S.Ct.738, 160 L.Ed.2d 621 (2005). The Courts were allowed to "tailor" the sentence according to 18 U.S.C. § 3553(a) factors.[4] Booker at 245.  The

---

[4]*Factors to be Considered in Imposing a Sentence. -  the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed, shall consider – (1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for – [in reference to the Sentencing Guidelines]; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.*

Guidelines became only one element to consider when determining a sentence.

Keith PULLAM is one of three children raised by a single mom whose income consisted of work at a fast food restaurant and welfare government benefits. The household was constantly short of money which meant inadequate food and clothing. With his mother working and having a drug problem, Mr. PULLAM had no parental guidance or family structure and would fend for himself and roam where he wanted to. During high school his life would begin to spiral out of control. He started using marijuana during high school and then rock cocaine a few years later. He eventually dropped out of high school at the beginning of his 11th grade. His contacts with law enforcement increased leading up to serving 14 years of a 16 year sentence for bank robbery. After his release from that term, his attempts at reintegration into society were obstructed by his criminal history, limited education, lack of substantial and consistent work history, and the state of the economy at the time. He could not and would not be able to find consistent and long term employment in which he could base a life on. For one job, he was in a work related car accident that required surgery. He still suffers great pain in his ankle and shoulder due to that accident. He must wear a brace to support his ankle and knee because of the injuries. Post-surgery and release from the hospital, he was prescribed

morphine and Vicodin as pain medication but that didn't work. He was given cortisone shots which helped but the relief is short-lived and the shots are regulated to be issued only three times a year. With unrelieved pain, he found out about OxyContin and was given a prescription by Lake Medical Group. He soon became addicted to the drug.

A sentence is formulated to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" The Defense wishes to point out that the essence of Mr. PULLAM's offense is Medicare fraud in which OxyContin was fraudulently obtained using Government funds in order to sell on the street for profit. Mr. PULLAM was used as an instrument for the furtherance of this fraud. This is borne out by Mr. PULLAM's Overt Acts: Numbers 30 and 31 involve Mr. PULLAM obtaining a prescription in his own name from a <u>co-defendant</u> physician. Number 32 involves Mr. PULLAM paying a <u>recruited</u> patient for his/her OxyContin. The Defense believes this qualification is important to distinguish considering, by being charged and sentenced under the drug umbrella of the Sentencing Guidelines, he is being sentenced using a widely recognized rigid and arbitrary drug quantity table and an excessive penalty structure that was instituted in a political climate of fear and belief that stricter drug sentencing guidelines would win the "war on drugs." The Defense has suggested a

clarification to the calculation of actual OxyContin involved. Per plea agreement, the actual amount of OxyContin involved is less than 50 KG over the 100,000 KG threshold for marijuana and suggests the use of a base level of 24 instead of the base level 26 designated by the Probation Office. Considering the vast range 100,000 to 400,000 KG marijuana base level 26 encompasses and considering the possible sentencing differences a base level 26 means as compared to base level 24, the Defense believes that it is significant enough to discuss this calculation so as to demonstrate the arbitrary use of a black and white numbering system pertaining to drug weights by the Sentencing Guidelines which results in the creation of an imperfect and unbalanced sentencing ranges which can often lead to disproportionate heavier sentencing. Even if the OxyContin amount used by the PSR is allowed, the unfairness to the system is still evident. Mr. PULLAM's PSR base offense level is calculated for 360 OxyContin pills (80mg each) which converts into 192.96 KG of marijuana. A level 26 base allows for a range of 100 to 400 KG of marijuana. Mr. PULLAM's base, in essence, is the same as someone whose offense involved twice as much OxyContin or 720 80mg pills (converted to 385.92 KG of marijuana). The drug quantity table ranges are overly broad in creating a base level and they don't provide a fair starting point for Mr. PULLAM in determining his sentence. Therefore the drug tables do

not promote respect for the law but rather they are an arbitrary mechanical construct in which the fairness of a just punishment in drug sentencing is in question.

A need for sentencing is "to afford adequate deterrence to criminal conduct[.]" There is no "adequate" deterrence for drug offenders until the country's drug problem is resolved. Sentencing more individuals for longer terms won't be a deterrence factor in this or future drug offenses. The "war on drugs" is failing and longer sentencing for deterrence purposes doesn't work.[5] Mr. PULLAM shouldn't be sentenced with the purpose that his penalty will be a deterrence factor to others.

## V.
## CONCLUSION

Mr. PULLAM has a drug dependency on pain medication because of his pain from his automobile accident. His actions in this offense are reflective of this addiction. He is not part of a drug cartel based in Mexico flooding the region with cocaine and methamphetamine. He has pain that fluctuates in intensity that will be with him for the rest of his

---

[5] . . . the proportion of drug offenders sentenced to prison has swelled from 79 percent in 1998 to 93 percent in 2004. Many of those are serving extraordinarily long sentences, receiving little or no addiction treatment, and growing older, sicker and more in need of taxpayer-provided medical care. The United States boasts the largest prison population in the world. And yet even the U.S. drug czar admits that our efforts are failing. After 40 years and $1 trillion spent, Gil Kerlikowske told the Associated Press last May, "it has not been successful ... the concern about drugs and drug problems is, if anything, magnified, intensified." *Mandatory Minimum Sentences Impede Justice*; Hon. Andre M. Davis of Baltimore, United States Court of Appeals for the Fourth Circuit. http://articles.baltimoresun.com/2011-12-08/

life and he got hooked on a medication to relieve that pain. His "work" for Lake Medical Group allowed him access to the pain medication.

The Defense believes Mr. PULLAM's sentence should reflect the following factors: his non-essential role in the fraud whose services to the scheme could easily have been found elsewhere; his acceptance of responsibility for his actions; 18 U.S.C. 3553(a) factors such as, the circumstances of his early life which heavily influenced the direction his adult life would take; his attempts at reintegration into mainstream life after serving time being hampered by a system easily willing to punish but not rehabilitate; the skewed and excessive drug sentencing guidelines; the accepted realization that excessive prison terms for drug offenses doesn't create a deterrence but just over-crowded prisons; and his addiction to a pain medication.

The Defense respectfully recommends a sentence of 30 to 37 months.

DATE: August 28, 2013       Respectfully submitted,

                            */s/ Paul W. Blake*
                            PAUL W. BLAKE
                            Attorney for Defendant
                            Keith Pullam